IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONTA JENKINS,

OPINION AND ORDER

Plaintiff,

17-cv-25-bbc

v.

JASEN MILLER, JAMIE GOHDE, LUCAS WEBER,
MICHAEL DITTMAN, SHAWN TOBIE,
ANDREW JEZUIT, RONALD SWENSON,
LINDSAY WALKER and CHRISTOPHER BORTZ,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Donta Jenkins is proceeding on claims that staff at the Columbia Correctional Institution violated his rights under the Eighth Amendment in the following ways: 1) defendants Shawn Tobie, Jasen Miller, Christopher Bortz, Ronald Swenson and Andrew Jezuit used excessive force against plaintiff after he stated he was suicidal and placed plaintiff in "control status" rather than "clinical observation" without any clothing, property or bedding; and 2) defendants Lindsay Walker, Lucas Weber, Jamie Gohde and Michael Dittman refused to provide plaintiff a mattress for 23 days. Now before the court is defendants' motion for summary judgment with respect to all of plaintiff's claims. Dkt. #45. (I have amended the caption of the complaint to reflect defendants' full names and the correct spelling of their names). For the reasons explained below, I am granting defendants' motion for summary judgment.

1

From the parties' proposed findings of fact, I find the following facts to be undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Donta Jenkins is currently incarcerated at the Waupun Correctional Institution. However, during all of the events at issue in this lawsuit, he was incarcerated at the Columbia Correctional Institution, where defendants worked in the following positions: defendant Michael Dittmann as the warden, defendant Lucas Weber as the security director, defendant Jamie Gohde as the health services unit manager, defendant Jasen Miller as a captain, defendant Lindsay Walker as a unit manager and defendants Shawn Tobie, Christopher Bortz, Ronald Swensen and Andrew Jezuit as correctional officers.

### B. Cell Extraction

During the evening of July 5, 2016, while defendant correctional officer Tobie was working at his assigned post in the restrictive housing unit, he observed a large amount of urine coming from plaintiff's cell and saw feces smeared on the window of the cell. Plaintiff was told to clean up the urine and feces. A short time later, Tobie returned to plaintiff's cell and found that plaintiff had covered the trap with his mattress and was not responding to the unit staff's orders to remove it. (Plaintiff says he did not hear or respond to any commands because he was having a mental breakdown and attempted to hang himself.) At

approximately 6:45 p.m., the sergeant of the restrictive housing unit notified defendant Captain Miller, the shift supervisor on duty at the time, who went to plaintiff's cell. (The parties dispute what happened when Miller went to plaintiff's cell. Plaintiff says that he told Miller that he was attempting to commit suicide. Miller says that he told plaintiff to take down the mattress and come to the cell door but that plaintiff did not comply and he did not say anything about attempting suicide.)

Defendant Miller assembled a cell entry team consisting of defendant officers Tobie, Bortz, Swensen and Jezuit. According to Miller, when verbal communication fails to gain an inmate's compliance and it is necessary to use force, a cell entry team is used to enter an area and safely secure and control an inmate using "dynamic techniques" and restraints. The cell entry team is made up of (1) the onsite security supervisor, who oversees the incident and makes sure that the proper amount of force is used to maintain control; 2) a camera operator who records the incident on video to document the incident; and (3) at least four staff members, who wear protective equipment, such as vests, gloves, helmets and pads and insure the safety and security of staff and the inmate. (Although plaintiff attempts to dispute Miller's explanation of the cell extraction procedure by accusing Miller of lying about not hearing plaintiff threaten suicide, he admits he is unaware of the policies and procedures used by correctional staff in these circumstances and has presented no evidence to refute Miller's description of these procedures.)

Prior to entering plaintiff's cell, defendant Miller gave a brief introduction on camera and then escorted the cell entry team to plaintiff's cell front. Defendants Captain Miller and

Officer Swensen gave plaintiff additional directives to come to the door to be restrained so he could be removed from his cell. Plaintiff did not respond. (Plaintiff again says he did not hear or respond to any commands because he was having a mental breakdown and attempting to hang himself.) Miller administered a burst of Oleoresin Capsicum, also known as pepper spray, into plaintiff's cell through the lower trap. (The parties argue about whether the burst can be described as "short." Defendants say that the burst lasted three seconds. The video of the incident shows that the burst lasted no more than four seconds.)

The officers opened the upper trap of plaintiff's cell and gave him more directives to come to the door, but plaintiff did not do so. Swensen was able to push the mattress over with his baton so the officers could look inside the cell. By shining a flashlight through the trap, the cell entry team could see plaintiff lying on the floor with what appeared be a ligature around his neck. In his incident report, defendant Swensen notes that "Ofc. Jezuit used his flashlight to scan the cell and inmate Jenkins was heard stating that he was hanging himself. I reported to Capt. Miller that I could see Jenkins on the cell floor with what appeared to be something wrapped around his neck." Dkt. #49, exh. 3 at 9. (Miller denies hearing or being told about plaintiff's statements.)

The team opened the cell door and entered the dark cell. About seven seconds passed between the time the officers entered plaintiff's cell and the time that one of the officers removed a covering that plaintiff had placed on his light fixture. (Plaintiff says that while he was lying on the floor of his cell in the dark, the four officers jumped on top of him and one of them punched him in his side. Defendant Miller avers that he did not see any of the

4

officers using unnecessary or excessive force to control plaintiff. None of the other officers have submitted affidavits. Defendants' actions during this time are not clear from the video because the cell is either dark or blocked by Miller, who is standing in the doorway. Video, dkt. #53, at 04:00-04:12.) After the light is uncovered in the cell, the video shows three officers kneeling on the floor beside plaintiff who is lying still and quiet while another officer is standing over them. Defendant Jezuit held plaintiff's legs and defendant Tobie held plaintiff's arms while defendant Bortz removed the ligature that was tied around plaintiff's neck.

After restraining plaintiff's legs and wrists, the officers held plaintiff by the upper arms and carried him to another area of the prison, where Jezuit removed plaintiff's clothing with dura-shears and staff conducted a strip search and shower of plaintiff. Plaintiff was then brought to see a nurse, who cleared plaintiff to return to a cell. (Plaintiff says, and the video confirms, that the nurse made statements to the effect that plaintiff should wait to attempt suicide until he is released from prison, but these statements are not relevant to plaintiff's claims against the named defendants.)

## C. Control and Observation Status

### 1. Prison policies

According to Miller, a security supervisor may place an inmate in control status if the inmate is a danger to himself or others, he exhibits disruptive or destructive behavior or he displays behavior that is out of control. To place an inmate on control status, there must

be a written conduct report or incident report. In control status, security staff determine the amount of property an inmate is allowed (to prevent misuse of the items), note the reason for the control placement and the property allowed on a DOC-112 form and conduct wellness checks on the inmate every 30 minutes.

Observation status is used to ensure an inmate's safety and the safety of others if the inmate is dangerous to himself or others. The amount of property the inmate receives is dictated by psychological services and noted on a DOC-112 form, along with the reason for the observation placement. While in observation status, inmates are checked by staff at least once every 15 minutes. Inmates on control status and those on observation status have the same access to psychological services unit staff and clinical services.

With respect to observation status, Wis. Admin. Code Ch. DOC 311.04 states in relevant part that

(1) Observation for mental health purposes is an involuntary or a voluntary nonpunitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or the safety of others. An inmate may be placed in observation for mental health purposes for one of the following reasons:

(a) The inmate is mentally ill and dangerous to himself or herself or others.

(b) The inmate is dangerous to himself or herself.

(2) An inmate is mentally ill if there is substantial evidence that the inmate has a substantial disorder of thought, mood, perception, orientation or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life in an institution, but does not include alcoholism.

(3) An inmate is dangerous if there is a substantial probability that the inmate will cause physical harm to himself or herself or others as manifested by any of the following:

\*     \*     \*

(b) The reasonable belief of others that violent behavior and serious physical harm is likely to occur because of a recent overt act, attempt or threat to do such physical harm.

(c) Serious self-destructive behavior or a threat of such behavior.


## 2. Plaintiff's placement in control status

At 7:30 p.m. on July 5, 2016, defendant Miller decided to place plaintiff in control status in the restrictive housing unit. Miller briefed the on-call psychologist, Dr. Maria Gambaro, who agreed with Miller's assessment that clinical observation placement status was not warranted. According to Dr. Gambaro, observation placement is appropriate for a genuine suicide attempt or act of self harm. Although she does not recall the July 2016 incident, she avers that she was able to conclude from a review of the incident reports that plaintiff was not attempting self-harm or suicide because the ligature did not cut off his circulation or restrict his breathing.

Plaintiff was not allowed any property when he entered control placement. He was placed naked in the cell, which had only a steel bunk and no mattress. (Plaintiff says that the cell was cold and that staff did not conduct regular wellness checks, but the observation log shows that a check occurred about every 30 minutes. Defendants say that they gave plaintiff a security smock around midnight and this fact is noted on the observation log, but

plaintiff says that he did not receive one.) Plaintiff was removed from control status at approximately 2:45 a.m. on July 6, 2016.

### D. Mattress Restriction

According to defendant Weber, Security Director, security restrictions are a tool used to protect the inmate and staff when an inmate's behavior poses a serious risk to the health and safety of the inmate or others. Security supervisors may place an inmate on security restrictions based on an inmate's negative actions or behavior. When an inmate abuses a privilege or misuses property, that property or privilege is taken away temporarily. The security director, his designee and medical or psychological staff must approve security restrictions, which may be imposed only for a maximum of 30 days. Restrictions are reviewed on an ongoing basis by a team of staff members. Modifications are made as appropriate, including giving the inmate more property and privileges as his behavior stabilizes or taking more privileges and property away if the inmate becomes unstable. If there is a medical concern, security staff may need to consult with the health services unit before placing an inmate on a security restriction.

On July 5, 2016, Weber approved restrictions on plaintiff's access to paper products and a mattress for 30 days because plaintiff had misused these items to cover his trap and window. These restrictions were lifted on July 28, 2016, after they had been in effect a total of 23 days. Under standard prison procedures, after plaintiff was released from control status on July 6, he again would have access to his clothing, a pillow, linens and a blanket.

(Defendants say that plaintiff would have received a black mat to sleep on, but plaintiff says that he never got one. Although prison records show that plaintiff was given an extra blanket to help his shoulder, plaintiff says that he did not receive one.)

On July 8, 2016, plaintiff received a conduct report for disobeying orders and holding his trap and was placed on back-of-cell, lower trap and bag meal restrictions for 30 days. The following week, plaintiff again engaged in disruptive behavior, covering his window with feces and toilet paper, smearing feces on his cell door and window, attempting to "dash" staff with water from his toilet and feces in a cup, attempting to flood his cell, swallowing an unknown amount of pills and pencils and threatening to hang himself. On July 17, 2016, Dr. Persike noted that observation status was not clinically warranted for plaintiff but recommended that plaintiff be placed on a modified property restriction, including the removal of all bed linens, because plaintiff had threatened to hang himself. (The parties do not say how long the linen restriction lasted.) Security staff also continued plaintiff's paper products restriction and placed him on an "officer-controlled" water restriction. According to plaintiff's activity log, he attended recreation on July 19, 22, 24 and 27 and went to the showers on July 16, 20, 23 and 27.

On July 7 and July 24, 2016, plaintiff filed inmate complaints about the mattress restriction exacerbating his back and shoulder problems. (Although plaintiff alleges in his complaint and states in his brief that he wrote defendants Weber, Gohde (the health services unit manager), and Walker (unit manger) about the lack of a mattress causing him pain, he has not submitted a sworn statement or any other evidence in support of that allegation

except for his July 24, 2016 complaint in which he refers to having written to Weber and Walker. Weber says that he has no record of receiving any correspondence from plaintiff on that issue. Gohde says that she did not receive or respond to any health service requests from plaintiff in July 2016. Walker did not submit an affidavit.)

Defendant Gohde was made aware of plaintiff's concerns because the complaint examiner contacted her in mid-July 2016 regarding plaintiff's inmate complaint. She confirmed at that time that plaintiff had no medical contraindication to a temporary mattress restriction but reported that plaintiff had complained of back and shoulder pain prior to the mattress restriction and had been referred for an appointment with physical therapy.

Defendant Dittmann had reviewing authority over plaintiff's inmate complaints. He did not receive the complaint examiner's recommendation on either of plaintiff's complaints until after the mattress restriction had ended.


OPINION

A. Excessive Force

Plaintiff contends that defendants Tobie, Miller, Bortz, Swenson and Jezuit responded to his expressed intent to harm himself by spraying him with a chemical agent that caused him to "choke uncontrollably" and then held him down and punched him in the side as they were putting handcuffs and shackles on him. To determine whether an officer has used excessive force against a prisoner in violation of the Eighth Amendment, the court

must consider "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320 (1986). The factors relevant to making this determination include:

- the need for the application of force;

- the relationship between the need and the amount of force that was used;

- the extent of injury inflicted;

- the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and

- any efforts made to temper the severity of a forceful response.

Id. at 321.

In Hudson v. McMillan, 503 U.S. 1, 9-10 (1992), the Supreme Court refined this standard, explaining that the extent of injury inflicted was one factor to be considered, but the absence of a significant injury did not bar a claim for excessive force so long as the officers used more than a minimal amount of force. Similarly, the Court of Appeals for the Seventh Circuit has cautioned district courts not to dismiss claims simply because the defendant used a small amount of force; rather, the court must consider all of the relevant factors. Washington v. Hively, 695 F.3d, 641, 642 (7th Cir. 2012). For a case to go to a jury, the evidence must show more than a mere dispute over the existence of alternatives; it must "support a reliable inference of wantonness in the infliction of pain." Whitley, 475 U.S. at 323. See also Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004) (citing same) (at

summary judgment plaintiff must present evidence to "support a reliable inference of wantonness in the infliction of pain").

1. Use of pepper spray

The use of chemical agents is not a violation of the Eighth Amendment in and of itself. Agents such as pepper spray can be used in limited quantities when they are reasonably necessary to subdue or maintain control over an inmate. Soto v. Dickey, 744 F.2d 1260, 1270-71 (7th Cir. 1984). Plaintiff contends that defendants' use of pepper spray was excessive because he was in the process of attempting to harm himself at the time. However, even if using pepper spray on a subdued inmate may be excessive under some circumstances, Abbott v. Sangamon County, Illinois, 705 F.3d 706, 727 (7th Cir. 2013) (discussing "general proposition" that use of pepper spray on subdued individual is excessive), courts have found that the use of chemical agents with inmates who have threatened self-harm and are not responding to orders is constitutionally reasonable. E.g., Barrett v. Wallace, 570 Fed. Appx. 598, 601 (7th Cir. 2014) ("The video recording of the cell extraction confirms that pepper spray was used only because Barrett – who was in need of prompt medical attention after overdosing – refused to leave his cell."); Bowers v. Pollard, 602 F. Supp. 2d 977, 988-89 (E.D. Wis. 2009), aff'd, 345 Fed. Appx. 191, 197 (7th Cir. 2009) (cell extraction using taser and chemical agents prompted by inmate who threatened self-harm, covered up cell window and hid under his mattress). Prison officials may not intentionally disregard the risk to inmates they know are at substantial risk of committing

suicide.  <u>Rosario v. Brawn</u>, 670 F.3d 816, 820-21 (7th Cir. 2012).  Therefore, the use of pepper spray violates the Eighth Amendment only if it is used "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain."  <u>Soto</u>, 744 F.3d at 1270-71.

In this case, a reasonable jury would conclude that plaintiff's behavior in this case justified a cell extraction.  Plaintiff admits that he dumped urine on the floor of his cell, smeared feces on his window, covered his window and lighting fixture, covered the trap in his cell door with his mattress and did not respond to staff's orders to clean his cell or remove the mattress.  Although the parties dispute whether any of the defendants—particularly Captain Miller—knew that plaintiff was attempting to hang himself before they applied the pepper spray, none of them knew what they would find upon entering plaintiff's cell, and they had no information from which they could conclude that plaintiff was unconscious or subdued at the time.  The undisputed facts and the video establish that plaintiff remained unresponsive and non-compliant.  In cases like this one, in which inmates refuse to obey orders given by prison staff, "some means must be used to compel compliance, such as a chemical agent or physical force."  <u>Soto</u>, 744 F.3d 1267.  <u>See also</u> <u>Kervin v. Barnes</u>, 144 Fed. Appx. 551, 552 (7th Cir. 2005) ("This court has held that prison guards may use chemical sprays when reasonably necessary to subdue recalcitrant prisoners, for orders must be obeyed, and there are only so many choices available to correctional officers when inmates refuse.").

The undisputed facts and the video show that the officers used pepper spray in a reasonable and measured manner to gain access to plaintiff's cell. <u>Santiago v. Walls</u>, 599 F.3d 749, 757 (7th Cir. 2010) (to prove excessive force, inmate must show that pepper spray was applied "maliciously and sadistically to cause harm" rather than in "good-faith effort" to gain compliance). After Miller assembled the cell extraction team and again tried to get plaintiff to come to his cell door and remove the mattress, Miller administered the pepper spray in a single three to four second-long burst in an effort to extract plaintiff from his cell. A reasonable jury would could not conclude from these facts that defendants used the pepper spray in quantities greater than necessary or for the sole purpose of inflicting pain or punishment. Therefore, defendants are entitled to summary judgment with respect to plaintiff's claim that they used excessive force in applying the pepper spray.

2. <u>Punching plaintiff in his side</u>

Plaintiff contends that after defendants Tobie, Bortz, Swensen and Jezuit entered his cell and jumped on top of him, one of them punched him in the side while he was lying on the floor in the dark. Miller says that he did not see anything inappropriate occur, but as the video shows, the cell was dark for a period of about seven seconds after Tobie, Bortz, Swensen and Jezuit entered it. It is impossible to tell from the video what occurred when the officers entered plaintiff's cell.

Although "[i]nitially it may appear as though this fact dispute would preclude summary judgment," summary judgment is "improper only if a jury reasonably could find

excessive force based on [plaintiff's] assertions." Boyd v. Pollard, 621 Fed. Appx. 352, 355-56 (7th Cir. 2015) (citing Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010) ("[S]ummary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations.")). Although Boyd is an unpublished opinion, it involves facts similar to those in Cyrus, 624 F.3d 865, and is instructive in this case. The Boyd plaintiffs alleged that guards used excessive force during a cell extraction when they bodyslammed Boyd onto a concrete floor, placed him in a chokehold and hit him in the face and head. Id. at 354. However, the defendant guard denied the allegations and a video confirmed most of the defendant's account, except for brief times when plaintiff was out of camera view. Id. Recognizing that the video was inconclusive and the parties presented different versions of the events, the court of appeals nonetheless determined "that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by Boyd—that the guards, when outside the camera's view, attacked Boyd." Id. at 356.

Apart from his vague allegation of being punched, plaintiff has not presented any evidence to corroborate his contention that defendants intended to cause him harm. Viewing the video makes it clear that the correctional officers acted in a calm and professional manner throughout. They provided ample opportunity for plaintiff to comply with their orders before entering the cell, exhibited a calm and controlled demeanor while they were in plaintiff's cell and escorting him to the shower and provided notice to plaintiff

of what they were doing and why they were doing it.  The video also reveals that a nurse saw plaintiff immediately after the incident and did not note or report any injuries to plaintiff.

It is entirely possible that plaintiff felt someone punch him in the dark after the officers entered his cell, because some physical contact is bound to result when officers are attempting to gain control of the situation.  As the Court of Appeals for the Seventh Circuit has explained, "[c]ustodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable."  Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012).  Further "[e]ven if 'it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable,' an error of judgment does not convert a prison security measure into a constitutional violation."  Id. (quoting Whitley, 475 U.S. at 319).

Because plaintiff does not provide any compelling evidence from which a reasonable jury could conclude that defendants acted maliciously while restraining him during the cell extraction, I will grant defendants' motion for summary judgment with respect to this aspect of plaintiff's excessive force claim as well.

## B.  Conditions of Confinement

Plaintiff contends that he was subjected to unconstitutional conditions of confinement because (1) defendants Miller, Tobie, Swensen, Bortz and Jezuit placed him in control status without any clothing, bedding or property for seven hours rather than under

clinical observation, and (2) defendants Walker, Weber, Gohde and Dittman forced him to sleep without a mattress for 23 days.

The Eighth Amendment guarantees prisoners "humane conditions of confinement," Farmer v. Brennan, 511 U.S. 825, 832 (1994), including adequate clothing and bedding. Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016); Gillis v. Litscher, 468 F.3d 488, 493 (7th Cir. 2006). To succeed on his Eighth Amendment claim, plaintiff must establish two things: (1) that being forced to stay in a cell without clothing, bedding or property for seven hours and to sleep on a steel bed for 23 days was, "from an objective standpoint, sufficiently serious that it result[ed] in the denial of 'the minimal civilized measure of life's necessities,'" and (2) defendants were deliberately indifferent to the adverse conditions. Gray, 826 F.3d at 1005. "An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it." Rice ex rel. Rice v. Corrections Medical Services, 675 F.3d 650, 665 (7th Cir. 2012). As explained below, plaintiff has failed to satisfy these requirements as to both of his conditions of confinement claims.

1. Control status

Although plaintiff contends that defendants Miller, Tobie, Swensen, Bortz and Jezuit subjected him to unconstitutional conditions of confinement by placing him in control status, it is undisputed that only Captain Miller made this decision and recommended the imposition of property and paper restrictions. Because there is no evidence that any of the

other officers had any personal involvement in that decision or that they had the authority to contradict it, they are entitled to summary judgment on this claim. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009) (§ 1983 limits liability to public employees who are personally responsible for constitutional violation); Hildebrandt v. Illinois Department of Natural Resources, 347 F.3d 1014, 1039 (7th Cir. 2003) (to be liable, defendant must have caused or participated in constitutional violation).

Plaintiff takes issue with the fact that Miller placed him in control status rather than under clinical observation, but he has failed to show how this decision adversely affected him. It is undisputed that in either control or observation status, inmates are regularly monitored, have access to psychological services and may be subject to property restrictions. The primary difference is that with control status, security personnel decide what property the inmate may have, whereas in observation status that decision is made by psychological services staff. Although plaintiff complains that he was placed in an empty cell without any clothing, linens or other property, he has failed to present any evidence from which a reasonable jury could conclude that observation status would have changed his property allowances. Just before plaintiff was placed in control status, he misused linens and his mattress in an alleged self-harm attempt. Even if the self-harm attempt was genuine, as plaintiff contends, there is no reason to believe that observation status would have afforded him any property, given his recent behavior. Cavalieri v. Shepard, 321 F.3d 616, 621 (7th Cir. 2003) ("[P]risons and jails have developed procedures for dealing with prisoners who display suicidal tendencies, such as removing items that could be used as a suicide weapon,

like sheets or a study telephone cord, or not leaving those prisoners unattended."). In fact, when plaintiff threatened to hang himself about a week later, he was placed on a linen restriction for his own safety. Further, in making his decision to place plaintiff in control status, Miller consulted the on-call clinician, Dr. Gambaro, who agreed at that time that plaintiff was not suicidal and that clinical observation was not warranted. Therefore, plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that defendant Miller acted with deliberate indifference in placing plaintiff in control status rather than observation status.

Plaintiff also contends that he was subjected to inhumane conditions while in control status because he was naked and had no property or furniture. As plaintiff points out, both this court and the Court of Appeals for the Seventh Circuit have allowed Eighth Amendment claims involving similar conditions to proceed to trial, but these cases usually involve deprivations that last for more than a week and also subject the prisoner to temperature extremes or unsanitary conditions. E.g., Townsend v. Cooper, 759 F.3d 678, 687 (7th Cir. 2014) (prisoner was "completely naked, with no clothing, shoes, bedding, linens, mattress, mail or legal materials" for periods totaling 259 days); Rice, 675 F.3d at 664 (mentally ill inmate left living in his own filth for significant periods of week or more over course of several months); Vinning-El v. Long, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner stripped of his clothing and property and place in segregation cell without working sink or toilet and covered with water, blood and feces for six days); Gillis v. Litscher, 468 F.3d 488, 489-90 (7th Cir. 2006) (prisoner placed in segregation cell, naked with no mattress or other bedding

and limited food and personal hygiene items for 12 days); <u>Ghashiyah v. Frank</u>, No. 07-C-308-C, 2007 WL 2061053, at *8 (W.D. Wis. July 12, 2007) (plaintiff "held in a cold cell, naked and without access to a bathroom" for several hours). In this case, plaintiff's stay in control status lasted only seven hours. Although plaintiff alleges that he was cold, there is no evidence that he was subjected to extremely cold temperatures or placed in unsanitary conditions.

Moreover, "plaintiff's conditions of confinement claim must be considered in the context of the plaintiff's status at the time." <u>Butler v. Meyers</u>, 2012 WL 996604, at *4 (E.D. Wis. Mar. 23, 2012). Only moments before he was placed in control status, plaintiff had been forcibly removed from his cell after he had used items in his cell to block the window, door and light fixture and place a ligature around his neck. Miller ordered the removal of plaintiff's property and clothing so he would not misuse them again. The restrictions were lifted seven hours later after plaintiff had calmed down. Because there is insufficient evidence from which a reasonable jury could conclude that defendant Miller's actions amounted to deliberate indifference, he is entitled to summary judgment on this claim.


2. <u>Mattress</u>

Plaintiff contends that the conditions of his confinement were unusually harsh because he was forced to sleep on a steel bed without a mattress for 23 days. (Although defendants say that plaintiff would have been provided a thin security mat to sleep on, plaintiff says that he did not get one.)

As an initial matter, I note that defendant Dittman is entitled to summary judgment on this claim because he had no personal involvement in approving the mattress restriction and was not notified about it until after it ended. Although Dittman reviewed plaintiff's complaint about not having a mattress, he did not receive the complaint until after plaintiff's mattress had already been returned. As I explained to plaintiff in the order screening his complaint, after the allegedly unconstitutional conduct is completed, there is nothing the official can do to stop it, so he cannot be held liable. George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007) ("[Plaintiff's] argument on the merits is that anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself. That proposition . . . is not correct. Only persons who cause or participate in the violations are responsible. . . . A guard who stands by and watches while another guard beats a prison violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

Similarly, there is no evidence from which a reasonable jury could conclude that defendant Gohde had any authority to remove the mattress restriction, which Miller and Weber imposed as a security measure in response to plaintiff's misuse of his mattress on July 5, 2016. Gohde was made aware of the restriction by the inmate complaint examiner who was seeking information on the effect of the restriction on plaintiff's shoulder and back. Her limited role was to offer an opinion on whether the mattress restriction was contraindicated in light of plaintiff's medical problems. Although plaintiff contends that the lack of a mattress contributed to his existing shoulder and back pain (the treatment of which is the

subject of another lawsuit in this court (W.D. Wis. case no. 16-cv-694-bbc)), he has presented no evidence to dispute Gohde's medical assessment that his shoulder and back problems would not preclude a mattress restriction.

The remaining defendants with respect to this claim, Walker and Weber, allegedly knew about the restriction and had the authority to remove it. However, plaintiff has failed to present sufficient evidence from which a reasonable jury could conclude that the restriction was serious enough to result in the denial of the minimal civilized measure of life's necessities. Even though courts have found that a lack of bedding for more than a week may qualify as the denial of a basic life necessity, Townsend v. Cooper, 759 F.3d 678, 687 (7th Cir. 2014), they have not found that the constitutional protection applies to uncomfortable beds or mattresses. E.g., Burton v. Downey, 805 F.3d 776, 786 (7th Cir. 2015) (unconstitutional conditions of confinement involve "deprivations of essential food, medical care, or sanitation" and plaintiff presented no evidence to support allegation that sleeping on single mattress amounted to deprivation of this magnitude); Putney v. Likin, 656 Fed. Appx. 642 (4th Cir. 2016) ("In this case, [the inmate] has so far failed to explain how the denial of a mattress was anything more than a discomfort."); Alfred v. Bryant, 378 Fed. Appx. 977, 980 (11th Cir. 2010) ("Objectively speaking, sleeping on a steel bed without a mattress for eighteen days, though uncomfortable, is not so extreme as to violate contemporary standards of decency."); Thomas v. Doe, 2016 WL 3951035, at *1 (C.D. Ill. July 20, 2016) ("While the thin mattress may have been uncomfortable, nothing suggests that Plaintiff suffered the type of extreme deprivation required to state a constitutional

claim."); <u>Marshall v. Nickel</u>, 2007 WL 5582139, at *9 (W.D. Wis. Jan. 29, 2007) (use of uncomfortable, rubber mat as mattress for several months failed to state claim under Eighth Amendment). As highly unpleasant as this may have been, the United States Supreme Court has made clear that "the Constitution . . . does not mandate comfortable prisons." <u>Farmer</u>, 511 U.S. at 832 (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981)).

In this case, plaintiff had his bedding (at least one blanket, linens and a pillow), his other property and his clothing during most of the relevant period. Although there is some evidence that a clinician placed plaintiff on a linen restriction on July 16, 2016, there is no evidence showing how long that particular restriction lasted or that Walker or Weber had any involvement in its imposition. (At most, plaintiff would have been without linens or a mattress for a period of 12 days.) Moreover, it is undisputed that the linen restriction was imposed for plaintiff's own safety because he had threatened to hang himself. Therefore, without more, plaintiff cannot show that defendants Walker and Weber acted with deliberate indifference to plaintiff's adverse conditions of confinement by requiring him to use an uncomfortable bed for a little less than a month. Accordingly, defendants' motion for summary judgment as to this claim will be granted.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, dkt. #45, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and

close this case.

Entered this 26th day of December, 2018.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge